UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 18-20957-CIV-CMA/Goodman

RUBY SOSA,

    Plaintiff,
v.

CARNIVAL CORPORATION,

    Defendant.
_____/

### PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXPERTS

Plaintiff, RUBY SOSA, by and through her undersigned counsel and pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), Federal Rule of Civil Procedure 26, the Federal Rules of Evidence, Southern District Local Rule 7.1, and this Court's Order Setting Trial and Pre-Trial Schedule [D.E. 18], hereby files her Motion to Strike the Experts of Defendant, CARNIVAL CORPORATION ("Carnival"), and in support thereof states as follows:

### I.   BACKGROUND

This maritime negligence action arises from severe injuries Plaintiff suffered as a result of a slip and fall onboard Defendant's vessel, the *Carnival Freedom*.  [*See* Compl. D.E. 1].  Defendant has disclosed three expert opinions in this matter:  Mr. Bryan Emond, a Professional Engineer and liability expert; Dr. David Keyes, M.D., an orthopedic surgeon; and Dr. Allen Singer, M.D., a mental health rebuttal expert.  A copy of Defendant's Expert Witness Disclosures is attached hereto as Exhibit "A," and a copy of Defendant's Rebuttal Expert Witness Disclosures is attached hereto as Exhibit "B".  For the following reasons, certain portions of these expert reports should

be excluded pursuant to the standards found in *Daubert*, 509 U.S. 579, Rule 26, and the Federal Rules of Evidence.

## II.  LEGAL STANDARD

Courts are charged with a "gatekeeping" role "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). A witness only qualifies as an expert if he provides specialized knowledge that will assist the jury and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (citing Fed.R.Evid. 702).

In determining whether the above factors are met, a court must consider whether "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable," and "(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

Additionally, Rule 26(a)(2)(B)(i) provides that an expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." If an expert disclosure is incorrect or incomplete, the expert has a duty to supplement "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A). Any information not disclosed under Rule 26(a) or 26(e) may not be used "to supply evidence … at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). *Companhia Energetica Potiguar v. Caterpillar, Inc.*, 2016 WL 3102225, *5 (S.D. Fla. June 2, 2016).

### III. MEMORANDUM OF LAW

Defendant's experts, or portions of their opinions, are due to be stricken for various reasons. With regard to Defendant's liability expert, Mr. Emond, his brief, vague report includes no methodology, and therefore violates Rule 26(a)(2)(B), and as a result his opinions are inherently unreliable under a *Daubert* analysis. *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 378 (N.D. Fla. 2017) ("The need for an expert to complete and explain his methodology is at the heart of reliability."). Dr. Singer's opinions are similarly unreliable, in that he provides no basis for his conclusions regarding Plaintiff's mental health conditions, and some of his opinions fall outside the scope of rebuttal to Plaintiff's "hybrid" mental health treating therapist, Mr. Hardy-Holley. *Home Design Sevcs. v. Hibiscus Homes of Fla.*, 2005 WL 2465020 (M.D. Fla. Oct. 6, 2005) (striking an expert opinion as untimely and outside the scope of proper rebuttal). Dr. Keyes' report also contains an insufficient factual basis for his opinions, while Dr. Keyes himself admits he does not possess the expertise to opine on Plaintiff's lumbar MRIs. Exhibit "B," *Additional Medical Record Review* dtd. 10/17/18, at 3.

**A.   Mr. Bryan Emond, P.E.**

**1.   *"Testing Location and Results" Contains No Methodology***

Mr. Emond's "Testing Location and Results" section of his expert report is due to be stricken because it is completely void of any methodology whatsoever. *See* Exhibit "A". Further, this fact was pointed out by Plaintiff's liability expert, Dr. Jahan Rasty, Ph.D., in the rebuttal report served on October 19, 2018; however, Defendant failed to take steps to supplement and/or correct Mr. Emond's disclosures. A copy of Dr. Rasty's rebuttal report is attached hereto as Exhibit "C".

In determining whether an expert's methodology is reliable, a court must consider (1) whether the methodology is capable of being tested; (2) whether the scientific technique has been

subject to peer review and publication; (3) whether the method has a known rate of error; and (4) whether the scientific community generally accepts the method used. *Quiet-Tech*, 326 F.3d at 1341.

Methodology that lacks the "intellectual rigor" required by Daubert, and instead uses unsupported "leaps of faith" condemned by Daubert, should be excluded. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). "And, on a more fundamental level, the focus of a *Daubert* inquiry 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Whelan v. Royal Caribbean Cruises Ltd.*, 976 F. Supp. 2d 1328, 1332 (S.D. Fla. 2013). *McCorvey*, 298 F.3d at 1257 ("Rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proferred expert's methodology").

For these reasons, it is imperative that an expert's report comply with the mandatory disclosure provisions of Rule 26(a)(2)(B), and contain "a complete statement of all opinions the witness will express and the basis and reasons for them," including "the facts or data considered by the witness" when forming his opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). This forms the basis of reliability of an expert opinion. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) ("The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*." (internal quotations omitted) (emphasis in original)).

Despite Mr. Emond's report citing to two of the American National Standards Institute ("ANSI") standards for testing the DCOF of walking surfaces, B101.3 and A326.3, his report contains **absolutely no methodology** or explanation as to how he performed the wet dynamic coefficient of friction ("DCOF") tests onboard the *Carnival Freedom*, and therefore Plaintiff is left

in the dark as to whether the tests were actually performed in accordance with these standards. *See* Exhibit "A". Mr. Emond fails to specify the steps taken and procedures followed during his DCOF testing. *Id.* Mr. Emond further fails to include important requirements for testing that would be applicable under both standards, causing his report to suffer from impermissible **"black box" syndrome**: "where 'data is fed at one end and … an answer emerges at the other, and the jury cannot see how the pieces fit together or how the data drives the conclusion.'" *Lee-Bolton*, 319 F.R.D. at 377.

In his rebuttal report, Plaintiff's expert, Dr. Rasty, points out the various deficiencies in Mr. Emond's report that undermine his final opinions:

- "[Mr. Emond] does not disclose the specific concentration of surfactants in the liquid used to wet the test tile surface," (or if any surfactants were applied at all),
- "[Mr. Emond] does not disclose the number of individual friction tests performed,"
- "[Mr. Emond] does not disclose the actual values obtained for each test run,"
- "[Mr. Emond] does not disclose whether he performed friction tests in four orthogonal directions per requirement of the standards," and
- "[Mr. Emond] does not disclose how the tiles were prepared prior to performing the friction tests."

Exhibit "C". Without outlining these significant factors in his methodology, it is impossible to test or verify Mr. Emond's results, an important consideration under *Daubert*. *Martinez v. Rabbit Tanaka Corp.*, 2006 WL 5100536, *13 (S.D. Fla. Jan. 6, 2006) (noting that plaintiff's expert's report "relies on no discernable methodology at all" and that none of his "conclusions is 'testable' or independently verifiable as envisioned by a *Daubert* inquiry"). Plaintiff is also prejudiced because she cannot verify or adequately rebut Mr. Emond's opinions. *Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1143 (S.D. Fla. 2016) (explaining that the failure to disclose was not

substantially justified or harmless, because it deprived the other party of the ability to prepare a rebuttal). *See also* Exhibit "C".

The Northern District of Florida struck a similarly unsupported expert opinion of a Dr. Wade in *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346 (N.D. Fla. 2017). *Lee-Bolton* was a class-action case brought by property owners against a lumber processing facility that allegedly contaminated their land. *Id.* at 351. The Plaintiffs disclosed Dr. Wade, a chemical fingerprinting expert, to show that Koppers' Site was the source of the contamination. *Id.* at 364. Similar to Mr. Emond's report in this case, "Dr. Wade's brief report provided little explanation and no details of his analysis." *Id.*

The defense expert in *Lee-Bolton*, similar to Plaintiff's expert in this case, pointed out the deficiencies in Dr. Wade's report as incomplete and unreliable. *Id.* at 368. Specifically, the Principal Component Analysis ("PCA") utilized by both experts had two forms of output, a factor score plot and a factor loading chart, which must be read together to determine causation. *Id.* The defense expert criticized Dr. Wade's report as "incomplete because he failed to explain whether or how he had evaluated the factor loading chart, which is what gives insight into the congeners driving the differences or similarities," *id.*, and "that without interpreting both sets of information, it is not possible to reliably evaluate the factor score plots or determine which congeners are creating the similarities and the differences within the PCA analysis, which is critical for distinguishing among sources [of contamination]," *id.* at 377.

Similarly here, Mr. Emond's report cannot be properly evaluated or rebutted because it omits crucial methodology that formed the basis of his opinions. For example, whether and what surfactant was used to prepare the floor prior to testing would have a direct effect on the results of Mr. Emond's DCOF tests; how many tests were performed and in what directions are significant

"facts or data" considered when formulating the values contained in Mr. Emond's "Testing Location and Results" table (Exhibit "A" at 7), yet they are omitted from his report; and the condition of the floor during testing is also important—did Mr. Emond's testing take place after the floor was just cleaned? Or after passengers had traversed the buffet line while getting food—similar to the conditions when Plaintiff's expert tested the floor? All of these factors would have an obvious effect on the friction values of the floor, yet, Mr. Emond's report fails to consider or explain them because it **contains no methodology**.

Mr. Emond's report in this case suffers from similar deficiencies as the plaintiff's expert opinion in *Lee-Bolton*: he "failed to explain how he had evaluated the factor score plots in relation to the factor loading chart, if he had done so at all, and also failed to provide any detail as to the 17 congeners and how they compared with the Koppers Site, other than to say he had calculated their sums," which makes Dr. Emond's report in this case similarly "incomplete and scientifically unreliable." *Id.* at 378.

In fact, Mr. Emond's report in this case is suspiciously vague. *Compare* Exhibit "A" to Exhibit "C". It is almost as if Defendant is inviting a *Daubert* hearing as an opportunity to supplement or to attempt to fill in the blanks of Mr. Emond's report. *But see Companhia*, 2016 WL 3102225, at *5 ("[A] report that suffers from a major omission cannot be cured by the use of supplementation." (citing *Goodbys Creek, LLC v. Arch. Ins. Co.*, 2009 WL 1139575, *2 (M.D. Fla. Apr. 27, 2009))).

In *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, the Eleventh Circuit affirmed the Southern District's exclusion of expert testimony that failed to contain a sufficient factual basis—and the District court's refusal to conduct a *Daubert* hearing. 402 F.3d 1092, 1113 (11th Cir. 2005). The Eleventh Circuit explained,

> [W]e stress that the burden of laying the proper foundation for the admission of expert testimony rests with its proponent. **Presenting a summary of a proferred expert's testimony in the form of conclusory statements devoid of any factual or analytical support is simply not enough**. The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact. As we have held previously, carrying this burden requires more than "the *ipse dixit* of the expert."

*Id.* (internal citations omitted) (emphasis supplied).

Expert reports containing "too great an analytical gap" between the data and the conclusions should be excluded. *Lee-Bolton*, 319 F.R.D. at 371. As explained by the Supreme Court in *General Electric v. Joiner*,

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proferred.

*General Electric v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). Such an analytical gap exists in Mr. Emond's report in this case, and as a result, renders his methodology and opinions unreliable. Mr. Emond's "Testing Location and Results," and the opinions derived therefrom, are properly excluded.

### 2. *"Vessel Information" and "Standards Review" Are Not Applicable Here*

Next, Plaintiff moves to strike two specific portions of Mr. Emond's report that are irrelevant to his ultimate opinions and the issues surrounding the DCOF of the interior tile floor upon which Plaintiff fell, as later recognized by Mr. Emond in his own Report. Mr. Emond includes the following irrelevant information with regard to the vessel's alleged compliance with The International Convention for Safety of Life at Sea ("SOLAS") and the US Coast Guard's Port State Control Inspections in the "Vessel Information" section of his Report:

> The Public records in the USCG PSIX database indicate that the ship had a valid SOLAS passenger ship safety certificate at the time of the accident. … The

> *Carnival Freedom* is also subject to Port State Control inspections. The USCG, as the maritime authority for the United States, performs Port State Control Verifications on ships like the *Carnival Freedom*. During Port State Control inspections, the USCG verifies compliance with international requirements, such as SOLAS. On cruise ships, these inspections begin as the ship is designed and built, and continue with annual inspections. These inspections include examination and testing of the ship's egress routes. PSIX records reviewed by S-E-A indicate that the vessel had a valid Certificate of Compliance issued by the USCG at the time of this incident. These records reviewed by S-E-A indicate no record of discrepancies related to any decks being considered slippery.

Exhibit "A," at 4. Yet, on the very next page, Mr. Emond recognizes that SOLAS does not apply to the interior tile flooring or the DCOF tests conducted in this case. Further, Mr. Emond fails to explain the connection between the Coast Guard's Port State Control Inspections, other than they are used to confirm compliance with the inapplicable SOLAS treaty (which, as described above, is irrelevant). *See* Exhibit "A". On page 5 of his Report, Mr. Emond provides:

> As stated above, the *Carnival Freedom* is subject to the international requirements of SOLAS. The regulations in SOLAS do not have specific, prescriptive requirements for walkways. The only reference to slip-resistance requirements for walking surfaces is in Chapter II-2, Regulation 13, Section 3.2. 4, *Details of Means of Escape*. This section requires that open (exposed to weather) stairways and passageways used as a means of escape have "slip-free surfaces underfoot." This rule provides no criteria or test method to determine whether a surface is slip-resistant.

Exhibit "A" at 5.

Not only does Mr. Emond recognize in his own Report that SOLAS does not apply here, but his inclusion of this information will undoubtedly cause confusion with the jury. Referencing a standard that is, by its own terms, inapplicable to wet DCOF testing of interior tile floors, while simultaneously conveying that Defendant's vessel complies with these inapplicable standards, will be confusing and misleading to the trier of fact. Further, Plaintiff's liability expert who opined on the DCOF of the tile floor used (one of the same) ANSI standards as Mr. Emond did in his testing; to include additional, admittedly irrelevant standards when discussing the DCOF of the interior tile floor in this case would be improper. As such, the above opinions are properly excluded.

### B. Dr. Allen Singer, M.D.

#### 1. *Dr. Singer's opinion that Plaintiff does not suffer from PTSD is unreliable*

Defense mental health *rebuttal* expert, Dr. Allen Singer, ultimately opines that Plaintiff does not suffer from Post-Traumatic Stress Disorder ("PTSD"), in contravention to Plaintiff's mental health treater, Mr. Hardy-Holley.  *See* Exhibit "B".  First, Plaintiff moves to exclude Dr. Singer's opinion that "Ms. Sosa does not have PTSD."  Exhibit "B," at 18.  In support of this opinion, Dr. Singer states that a slip and fall, resulting in traumatic injury, can never form the basis of a PTSD diagnosis, and that if it did, every person who ever slipped and fell could be diagnosed with PTSD.  Exhibit "B".  These outlandish opinions are not supported by any methodology outlined in Dr. Singer's report.

When evaluating the reliability of scientific expert opinion, the courts should consider:  (1) whether the expert's methods can be and have been tested; (2) whether the methods are subject to peer-review or publication; (3) the potential or known rate of error; and (4) whether the method is generally accepted in the scientific community.  *U.S. v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citations omitted).  If a witness relies primarily on his or her experience in lieu of a scientific methodology, "then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Id.* at 1261.

Dr. Singer specifically states as follows:  "Slipping and falling and having acute pain is not considered [a] medically/psychiatrically sufficient event to be considered for the diagnosis of PTSD."  Exhibit "B," at 19.  He goes on to state, "if Ms. Sosa['s] injury qualified her for PTSD, then every person who ever fell or slipped on the ice (or virtually any orthopedic accident) could

be eligible for the diagnosis of PTSD." *Id.* Finally, Dr. Singer concludes that "Ms. Sosa did not meet the "A" criteria for PTSD so she cannot, by definition, have PTSD." *Id.*

Dr. Singer provides absolutely no reliable methodology for his conclusory opinions. On what does Dr. Singer rely to make the assertion that no slip and fall injury could ever result in a diagnosis of PTSD? Is this based on his own independent experience or peer-reviewed publications? The only explanation Dr. Singer supplies in support of this outlandish assertion is the illogical "slippery slope" / "false dilemma": If Ms. Sosa suffers from PTSD from her slip and fall, then every person who ever slipped and fell would be diagnosed with PTSD. This is hardly a reliable basis for Dr. Singer's conclusion that Plaintiff fails to meet the "A" criterion for PTSD.

Further, Dr. Singer concludes that Plaintiff does not suffer from the "severity nor quantity" of symptoms "to meet the subsequent criteria for PTSD." Exhibit "B," at 19. But, again, Dr. Singer fails to provide a reliable basis for his opinions. Even his statements regarding Ms. Sosa's symptoms are contradictory: "Ms. Sosa easily recounted and thoroughly discussed the entirety of her experience without any observable signs of emotional distress whatsoever. … At one point she was appropriately tearful." *Id.* at 18. "She denied nightmares … though did have occasional bad dreams about slipping…." *Id.* at 19. Dr. Singer points to nothing—no experience, no psychiatric journals, no peer-reviewed studies—in support of these conclusions forming the basis of his opinion that Plaintiff never suffered from PTSD.

Ultimately, Dr. Singer's conclusory assertions that Ms. Sosa "did not and does not suffer from PTSD" is supported by nothing other than Dr. Singer's own *ipse dixit*. As such, these unsupported opinions are properly excluded. *Frazier*, 387 F.3d at 1261 ("[I]t remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." (citing *Daubert*, 509 U.S. at 590));

*Kumho Tire v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (citation omitted)).

### 2. *Dr. Singer's opinions are clearly outside the scope of rebuttal to Mr. Hardy-Holley*

Next, Dr. Singer's report includes opinions that are clearly outside the scope of rebuttal to Plaintiff's mental health treater, Donald Hardy-Holley, pursuant to Rule 26, and were not served until the extended rebuttal deadline of October 19, 2018. *See* Exhibit "B"; s*ee also* [D.E. 18, 36]. A copy of Plaintiff's Rule 26 Expert/Hybrid Disclosures and a copy of Plaintiff's Supplemental Rule 26 Expert/Hybrid Disclosures containing Mr. Hardy-Holley's written opinions are attached hereto as Exhibit "D".

Defendant, through its disclosure of Dr. Singer, attempts to include opinions regarding Plaintiff's past shoulder and lumbar pain, which Mr. Hardy-Holley did not specifically opine upon, are irrelevant to Dr. Singer's mental health opinions (specifically, rebutting Mr. Hardy-Holley's opinion that Plaintiff suffers from PTSD as a result of the incident), and are outside the scope of Dr. Singer's expertise, by his own admission. *See* Exhibit "B".

Under Rule 26(a)(2)(D)(ii), rebuttal expert testimony is permitted "only where it 'is intended solely to contradict or rebut evidence **on the same subject matter** identified by another party,'" and "[s]uch testimony 'cannot be used to advance new arguments or new evidence.'" *Blake v. Securitas Sec. Svcs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (citations omitted) (emphasis supplied). The purpose of rebuttal testimony, rather, is to "explain, repel, counteract, or disprove evidence of the adverse party." *Id.* (citation omitted). "Where a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony

may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order." *Id.* at 18.

Mr. Hardy-Holley, while considering Plaintiff's general levels of pain in the course of his mental health therapy, did not specifically opine as to whether Plaintiff's lumbar pain was pre-existing, and ***did not render any opinions on Plaintiff's lumbar MRI results***. Exhibit "D". The following opinions of defense expert Dr. Singer are clearly outside the scope of rebuttal and appropriately stricken:

- Ms. Sosa reported similar symptoms, other than the hamstring injury, going back to 2005.

- Her recent[] lumbar MRI, as described, is virtually unchanged from the 2014 study done prior to the accident.

- Her current and most severe pain, her back pain, was documented as a 5-6 back to 2014.  It is now an 8.  There were similar previous findings with her bruxism and shoulder pain.  It is outside the expertise of this examiner whether those symptoms are attributable to the accident or are unrelated and an expected progression of previous spinal disease and fibromyalgia.

- Ms. Sosa, though, seemed to attribute all of her pain to the accident.  It was well documented she had clinically relevant back pain, shoulder pain and bruxism prior to the accident.  It is highly unlikely that all of her back and shoulder pain and bruxism are due to the accident since these medical conditions were clearly documented prior to the accident.

Exhibit "B," at 20.  Dr. Singer also unnecessarily includes the following description of Plaintiff's lumbar MRI results, which are also outside the scope of rebuttal and do not support his opinions regarding Plaintiff's mental health in any way:

- 8/6/14 "Cont's with bilateral shoulder and back pains, Pain level 5-6"

- 6/7/14 X-ray of lumbar and sacral spine ordered for lumbago with radiculopathy—lumbar pain and right shoulder pain

- 4/17/14 continue shoulder and back pain, 6/10

- 6/13/14 lumbar spine x-ray—mild facet hypertrophy, most pronounced at L5-S1

- 6/26/14 MRI of spine—degenerating bulging discs with facet arthropathy at L4-L5, bilateral foraminal narrowing L5-S1.

- Her back pain is also worse and now is the greatest source of pain for her (whether this is due to the natural progression of her previous pain or due to the accident is beyond the expertise of this examiner).

- Her shoulder pain is also a continuing source of pain and limitation (again, whether this is due to the natural progression of her previous shoulder pain or due to this injury is beyond the expertise of this examiner).

Exhibit "B," at 15.

In *Home Design Services v. Hibiscus Homes of Florida*, the Middle District struck a portion of a party's expert opinion as untimely and outside the scope of proper rebuttal pursuant to Rule 26, in a copyright infringement action brought against a homebuilder. 2005 WL 2465020, *1, 5 (M.D. Fla. Oct. 6, 2005). The report provided by plaintiff's rebuttal expert, Dr. Nunez, report both rebutted the defense expert, Dr. Fishkind, "and offer[ed] separate and distinct analysis." *Id.* at *4. In striking the expert's opinion as outside the scope of rebuttal, the court stated:

> Mr. Nunez does not tie these conclusory statements to Dr. Fishkind's report or any of the materials used in Dr. Fishkind's report. These assertions in Paragraph 5 of Mr. Nunez's report cannot be reasonably classified as rebuttal evidence, as they represent independent analysis which should have been disclosed [by the initial expert disclosure deadline]. Non-rebuttal, expert evidence which casts doubt on an opposing expert's report cannot be admitted under the thirty-day period for rebuttal evidence provided in Rule 26(a)(2).

*Id.* at *5 (citing *Daly v. FESCO Agencies NA, Inc.*, 108 Fed. Appx. 476, 480 (9th Cir. 2004)).

Similarly, in *Blake v. Securitas Security Services*, the District Court for the District of Columbia struck a portion of the plaintiff's rebuttal expert's opinions that went beyond the scope of appropriate rebuttal testimony. 292 F.R.D. at 18-19. *Blake* dealt with a student who jumped or fell off a balcony while at a high school dance, and the student raised claims of negligence security against defendant. *Id.* at 16. The defendant named two security experts who opined on "who may or may not have been responsible for securing the relevant areas of the school and whether those

individuals met the appropriate standard of care in providing security at the event." *Id.* at 18.  But the Plaintiff, through his rebuttal expert, sought to introduce testimony that he "did not intentionally or planfully jump from the balcony as a means of committing suicide or otherwise injuring himself," and that the "fall was most likely the result of a state of acute disorientation and panic," both outside the scope of allowable rebuttal to defendant's experts' opinions. *Id.* ("As Garmoe is responding to an argument that appears nowhere in the opinions of Defendant's experts, his testimony on this issue must be struck.").  The court agreed with defendant that the plaintiff was attempting to offer new opinions under the guise of rebuttal, and precluded the plaintiff from offering the new opinions of its rebuttal expert at trial. *Id.* at 19.

Here, the above proffered opinions of Dr. Singer are similarly outside the scope of Mr. Hardy-Holley's written reports in this case and appropriately excluded. *Compare* Exhibit "B" with Exhibit "D".  Mr. Hardy-Holley does not opine on Plaintiff's lumbar condition, and it is Plaintiff's position that this unnecessary and irrelevant information is a belated attempt by Carnival to introduce additional testimony regarding Plaintiff's lumbar condition in order to bolster Defendant's position that Plaintiff's back pain was pre-existing and/or degenerative in nature.  There are plenty of treating orthopedic physicians and orthopedic experts in this case to opine on Plaintiff's lumbar spine.  The Court should exclude the above opinions of Dr. Singer, as irrelevant and outside the scope of rebuttal.

### C.  Dr. David Keyes, M.D.

Plaintiff next moves to exclude Dr. Keyes's opinions regarding Plaintiff's lumbar conditions, which are unsupported by the medical records and any methodology whatsoever:

- That "the MRI findings in the lumbar spine, while age-indeterminate, are most likely preexisting and not associated with the described injury."

Exhibit "A," *Orthopedic Medical Evaluation* dtd. 7/30/18, at 4.  This opinion is plainly contradictory and not based on a reliable methodology.  If Dr. Keyes renders this opinion based on his experience, he does not explain "how that experience leads to the conclusion reached … and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261.

Dr. Keyes next opines regarding an alleged prior lower back "injury" Plaintiff suffered—however, Plaintiff's medical records contain **no mention of any prior back injury**.  While Plaintiff did undergo a lumbar MRI prior to the incident alleged in the Complaint, Dr. Keyes fails to support his ultimate conclusion that Plaintiff's current lumbar injuries were pre-existing by pointing to any specific findings between the two MRI reports.  Dr. Keyes offers absolutely no explanation for his conclusions in this case:

- "Ms. Sosa had a prior lower back pain injury with persistent symptoms.  I looked back at the MRI report of the lumbar spine performed on 05/23/2013.  I again point out the official report showed only disc bulging, not disc herniations as noted by Dr. Fulp.  It remains my opinion that there is no indication for the epidural steroid injection or microlumbar discectomy."

Exhibit "B," *Additional Medical Record Review* dtd. 9/24/18, at 4.  Again, Dr. Keyes offers no explanations for his conclusions.  If we are to rely on his experience, he fails to address how or why that experience would apply; in fact, Dr. Keyes goes on to state, at the end of his report:

- "Given the different opinions as to the findings on the MRI study of the lumbar spine, I would recommend that a neuroradiologist with expertise in MRI imaging look at the MRI study of the lumbar spine."

Exhibit "B," *Additional Medical Record Review* dtd. 10/17/18, at 3.  Dr. Keyes so much as admits that he is not qualified to opine on the differences between Plaintiff's lumbar MRIs.  As he is admittedly unqualified, these opinions should be excluded.

In *Bowers v. Norfolk Southern Corp.*, the Middle District of Georgia excluded the proferred medical opinion of a CME physician, Dr. Wardell, regarding the cause of plaintiff's injuries.  537

F. Supp. 2d 1343 (M.D. Ga. 2007). Dr. Wardell opined, after conducting a differential diagnosis, that a long train ride with heavy vibration caused permanent aggravation of plaintiff's back condition; however, the court found that his opinions were ultimately unsupported. *Id.* at 1354. The court explained:

> Simply stated, Dr. Wardell cannot satisfy any of the *Daubert* factors: he has not demonstrated that his causation opinions are testable; he has not offered any error rate for his opinions; he has not shown any evidence that his opinions have been peer reviewed or that he used a peer-review source to reach his opinions; and finally, he has not shown the general acceptance of his opinions. Consequently, his opinions fail all four of the *Daubert* factors.

*Id.* at 1353-54.

Similarly here, Dr. Keyes fails to provide any reliable methodology in support of his opinions regarding Plaintiff's lumbar MRI results and his opinion that her lumbar injuries were pre-existing. He even admits that he is not qualified to read the lumbar MRIs for comparison purposes. As such, these opinions are appropriately stricken.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an Order striking the above expert witnesses and/or portions of their opinions in accordance with *Daubert*, the Federal Rules of Evidence, and/or the Federal Rules of Civil Procedure, and grant any other further relief this Court deems just and proper.

## RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3) of the Local Rules for the Southern District of Florida, I hereby certify that undersigned counsel for Plaintiff has conferred with counsel for Defendant, and the parties could not reach agreement.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via E-Mail through the CM/ECF system on this **6th day of November, 2018**, to counsel for Defendant, J. Michael Magee, Esq., at mmagee@carnival.com, CARNIVAL CRUISE LINES, 3655 NW 87th Ave., Miami, Florida 33178, Defendant's co-counsel, Jeffrey Foreman, Esq., at jforeman@fflegal.com, and Noah Silverman, Esq., at nsilverman@fflegal.com, FOREMAN FRIEDMAN, P.A., 2 S. Biscayne Blvd., Suite 2300, Miami, Florida 33131, and Plaintiff's co-counsel, Joseph Madalon, Esq., at pleadings@madalonlaw.com.

>
> BILLERA LAW, PLLC
> *Attorneys for Plaintiff*
> 2201 NW Corporate Blvd., Suite 200
> Boca Raton, FL 33431
> Telephone: (561) 218-4639
> Facsimile: (561) 826-7847
> Maritime@billeralaw.com
>
> By: __/s/ *Jessica Quiggle*_____
>     JESSICA QUIGGLE, ESQ.
>     Florida Bar No.: 107051