# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 18-20957-CIV-ALTONAGA/GOODMAN

RUBY SOSA,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## <u>ORDER ON PLAINTIFF'S SPOLIATION SANCTIONS MOTION</u>

"Where there's smoke, there's fire" is a well-known idiom; it means that when there is an indication of something bad, then the indication is usually correct. Plaintiff Ruby Sosa's spoliation motion implicitly invokes this folksy phrase. Sosa, a passenger who alleges that she slipped and fell on some water while aboard a cruise operated by Defendant Carnival Corporation, argues that she is entitled to sanctions because Carnival cannot produce the closed-circuit television ("CCTV") video of her fall and cannot explain why it went missing. Sosa contends that the lost CCTV footage, together with other factors, is circumstantial evidence (i.e., the smoke) of Carnival's bad faith (i.e., the fire), which entitles her to an adverse inference jury instruction or an order striking some of Carnival's affirmative defenses.

Carnival concedes that the CCTV footage existed and that it had a duty to

preserve it. But Carnival denies that it acted in bad faith or that there is any evidence of bad faith. Carnival claims that it simply does not know how or why the CCTV footage went missing after its security officer viewed the video and then (allegedly) took steps to download it to a shipboard computer drive. Carnival characterizes Sosa's spoliation theory as incorrect and unfair and submits several other possible reasons for the CCTV footage's unavailability (and that none of them involved bad faith).

Moreover, Carnival did not in any way discipline the security officer who investigated the incident and allegedly downloaded (or tried to download) the video footage. Carnival also notes that it has no indication that the security officer is responsible for the lost footage (as opposed to another Carnival employee or a technical glitch or computer snafu).

Thus, Carnival's views on the sanctions motion could be described as invoking two other colloquialisms: (1) "C'est la vie" ("that's life," or "that's how things happen") and (2) "stuff happens." In other words, Carnival's perspective is that life is full of unpredictable events and that bad results sometimes occur for no particular reason.

There are, to be sure, some circumstances surrounding the lost footage that could be deemed atypical or even suspicious. But they do not *necessarily* mean that Carnival was engaged in bad faith (i.e., that it intended to destroy the footage). They *might* evidence bad faith, or they might indicate that Carnival failed to take reasonable steps to preserve the footage, but *without* bad faith. Phrased differently, the unusual

circumstances might be evidence of mere negligence or recklessness, or they could indicate nothing about Carnival's culpability (because circumstances beyond Carnival's control could theoretically be responsible for the loss).

Focusing on Sosa's sanctions request, Carnival argues that Sosa has other evidence besides the video footage to prove whether standing water caused her fall and whether Carnival was on notice of the hazard. Therefore, Carnival contends, the prejudice is minimized, and strict sanctions are not warranted.

On the other hand, the CCTV footage is (or could be) a highly relevant piece of evidence, and Carnival has not adequately explained its absence. And the loss of the video footage might undermine Sosa's case to some degree.

Resolving the dispute is made more difficult because the parties cannot agree on which legal standard applies -- and the result would likely be different depending on which rule controls. Carnival contends that Federal Rule of Civil Procedure 37(e) applies, while Sosa says that the Court's inherent authority, as developed in the common law, governs.

The position Sosa urges is strategically intriguing, to say the least, as Sosa would likely stand a *better* chance of obtaining meaningful relief under Rule 37. That is because (1) the inherent-authority doctrine she invokes always requires bad faith, while Rule 37 authorizes some relief for the loss of electronically stored information ("ESI") without bad faith, and (2) sanctions imposed under the inherent-authority doctrine are

permitted only when the missing evidence is "crucial" to the movant's case, while Rule 37 does not require the prejudice to reach that level.

Nevertheless, that is Sosa's position.

But Carnival has embraced a legal position that is also strategically curious. Under the inherent-authority doctrine, which Carnival says is *inapplicable*, Sosa would need to establish bad faith (not mere negligence or recklessness) and that the lost video footage was crucial to her case. Those are significant burdens, and they would make it more difficult for Sosa to receive the adverse inference jury instruction she seeks. And yet Carnival is advocating for Rule 37, which permits Sosa to obtain some relief in the absence of bad faith and even if the lost footage is not crucial to her case.

Nevertheless, that is Carnival's position.

Each side, in short, is encouraging a legal standard for spoliation that is more advantageous to its *opponent*.

Looking past this atypical strategic lineup of legal blueprints urged by the parties, the factual record here is murky, making analysis more complicated. The Carnival security officer has not given a deposition. And Carnival has no explanation for the loss of the video, proffering instead only speculative theories. Thus, the Undersigned cannot comfortably decide on this incomplete record whether Carnival had the requisite intent to deprive Sosa of the ability to use the video in this lawsuit. If Rule 37 applies, then a bad-faith finding would not be required to impose the less-harsh

sanctions (e.g., the adverse inference type of sanction would not be used). But if Rule 37 did not apply and the inherent-authority doctrine were to be used, then a bad-faith finding would be required.

Determining whether Rule 37 even applies in the first place depends on whether the missing CCTV footage constitutes ESI under Rule 37, which does not expressly define ESI. The parties disagree on this issue, as well. Sosa now contends that the lost CCTV footage is not ESI (even though she said it was ESI at the hearing), while Carnival takes the position (and has always taken the position in this case) that the footage is ESI.

For reasons outlined below, the Undersigned concludes that the lost CCTV footage *is* ESI covered by Rule 37. Sosa confuses the issue of whether a remedy (or sanction) should be imposed when ESI is lost with the issue of whether the lost evidence is ESI in the first place.

Although the Undersigned finds that the lost footage is ESI and that Carnival failed to take reasonable steps to preserve it, the specific sanctions envisioned by Sosa will not be resolved here. Instead, the Undersigned concludes that it is appropriate to submit the important, fact-based assessment about Carnival's alleged bad faith (i.e., an "intent to deprive," under the language of Rule 37) to the jury. The advisory committee's notes to the 2015 amendment to Rule 37 expressly contemplate a scenario where the Court "conclude[s] that the intent finding should be made by a jury." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment. The jury will decide whether

Carnival had the requisite intent to deprive, which, if decided in Sosa's favor, would justify the harsher-type sanctions authorized by the rule -- including a permissible inference that the missing video would harm Carnival's position.

Sosa will be permitted to present evidence of the CCTV video's destruction or loss (and the surrounding circumstances) and to argue to the jury that Carnival engaged in bad faith (i.e., had the "intent to deprive" required by the rule) and had a strategic reason for doing so. Carnival, for its part, will likewise be permitted to present evidence of the circumstances it believes demonstrate an innocuous reason for its inability to find the CCTV footage and to argue that it had no nefarious or strategic agenda for causing its loss.

If the jury makes the requisite intent finding under Rule 37, then Sosa would be entitled to a permissible (not mandatory) inference jury instruction. But if the jury does not make this intent finding, then it may not infer or presume that the footage was unfavorable to Carnival. And if the jury does not make the finding, then one type of relief under Rule 37 that does not require intent will have already occurred: "permitting the parties to present evidence and argument to the jury regarding the loss of information." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

Depending on how the evidence is presented at trial, the Court can also provide one *additional* type of curative measure not available under the intent-required measures of Rule 37: "giving the jury instructions to assist in its evaluation of such evidence or

argument." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

But Sosa will be given the *choice* of whether to use the primary remedy, as there could be some negative consequences (to her) flowing from it. This order will provide the specifics of Sosa's choice after assessing the facts and law surrounding the key question of whether sanctions of any type are warranted.

## I.     Factual and Procedural Background

Sosa alleges that she slipped and fell on a tiled floor in the buffet area of the cruise ship Carnival *Freedom*. Carnival contends that the tiled buffet floor is "walled off" from the carpeted dining area by long, couch-style seating topped with decorative ironwork. [ECF No. 47, p. 2].

Ship security officers claim to have reviewed the CCTV footage from the dining room after Sosa's fall. The Security Watch Report says that the floor where Sosa "apparently" slipped was *not visible* in the footage because the view was "blocked by couch walls." [ECF No. 38-4, pp. 6–7]. Nevertheless, Carnival contends that security officers preserved (or thought they preserved) the CCTV footage for future reference, noting in the Security Watch Report that "CCTV footage *is* saved in F drive under Exacq vision files." *Id.* at p. 7 (emphasis added).

According to Carnival, although the CCTV footage did not show the floor where Sosa fell, a photograph of her, her footwear, and the tiled floor was taken at the time and later produced to Sosa as part of the Security Watch Report.

Carnival's corporate representative, Monica Petisco, testified that the F drive is one of the drives on the ship's computer. [ECF No. 38-1, p. 45:3–5]. Petisco testified that, generally, CCTV is saved on board by pulling footage, putting it into a dropbox, and then saving it to a drive or a flash drive. [ECF No. 38-1, pp. 17:13–21, 20:22–21:25]. She explained that the dropbox is a temporary place to store a big file, with a 14-day retention cycle. [ECF No. 38-1, p. 21:5–15]. Files can be copied from the dropbox and then saved in another drive on the same computer, in an external drive, or in a flash drive. [ECF No. 38-1, p. 21:18–21].

Carnival's June 22, 2018 discovery response represented that the CCTV footage *was* preserved and *would* be produced. [ECF No. 38-2, p. 3]. This assurance proved to be incorrect. Carnival now says that this incorrect response was reasonably based on the security notation that the CCTV had been preserved on the F drive. Petisco, who has worked for Carnival for 12 years and has served as a litigation representative for 3 years, testified that she never before this lawsuit had an issue of missing CCTV footage in any other case. [ECF No. 38-1, pp. 5:15–6:16, 18:9–11]

When the CCTV footage could not be readily located by shipboard security, Carnival enlisted the *Freedom*'s IT Officer, Tian Peng, to search the onboard computers for the footage, but he could not locate it. [ECF No. 38-1, p. 25:2–8]. After unsuccessful efforts to locate and retrieve the subject footage, Carnival supplemented its discovery responses on July 31, 2018, to reflect that the CCTV footage could not be found. [ECF

No. 38-3]. Petisco surmised that because the CCTV footage could not be located on the onboard computer, it was likely viewed by security from the dropbox but *not* later saved to a drive on the onboard computer. [ECF No. 38-1, p. 33:3–11]. Petisco testified that the F drive is "one of the drives on the computer on board," but she did not know whether the F drive was a dropbox or an external drive. [ECF No. 38-1, p. 45:3–10].

Assistant Chief Security Officer James Desouza was one of the security officers responsible for preserving CCTV footage in connection with shipboard incidents. [ECF No. 38-1, pp. 28:22–29:12]. Carnival disclosed Desouza in its initial Rule 26 disclosures served May 23, 2018. [ECF No. 47-1]. The initial disclosure did not explain his role in viewing the videotape, trying to save it to a computer drive, or later learning that it could not be located. *See id.*

According to Carnival, Sosa first requested Desouza's deposition on September 10, 2018. [ECF Nos. 47, p. 3; 38-15]. But Desouza signed off for his end-of-contract vacation on September 9, 2018. [ECF No. 38-1, p. 67:7-24]. He is scheduled to return to work on January 13, 2019. [ECF No. 38-1, p. 67:7–9]. Sosa "believes the timing of this 'vacation' and Carnival's discovery responses were no coincidence." [ECF No. 38, p. 15].

To accommodate Sosa's request for Desouza's deposition, Carnival contacted Desouza in India, who said that technical and logistical issues prevented him from participating in a satellite video deposition from where he resides. [ECF No. 47, p. 3]. On October 8, 2018, Carnival told Sosa that Desouza offered to participate in a *telephone*

deposition, but Sosa *rejected the offer*, saying that "Carnival should continue its efforts to find accommodations for a video depo." [ECF Nos. 47, p. 3; 47-3, p. 2].

Although it was unable to produce the CCTV footage, Carnival produced the security watch report summarizing the footage, Sosa's photograph on the floor, and the security watch summary of crew and passenger interviews, among other things. [ECF No. 38-4]. Sosa then took the depositions of six witnesses and questioned them about the alleged water, about complaints made to Carnival employees about the water before the incident, and about Sosa's injuries. [ECF No. 47, p. 4].

Sosa suggests that Carnival was engaged in discovery shenanigans, contending in her motion that "[t]he only security officer with knowledge of exactly what happened to the CCTV footage in this case was *sent to India* in the midst of this dispute, *conveniently* out of reach of being deposed." [ECF No. 38, p. 4 (emphasis added)]. Sosa alleges that "mounting circumstantial evidence" establishes Carnival's purported bad faith. *Id.* In addition to the fact that Desouza is now in India and is not scheduled to return until January 2019, Sosa argues that Desouza failed to complete his investigation because "halfway through, for reasons unknown and never explained," Desouza unilaterally decided to stop his investigation. [ECF No. 38, p. 4].

Although Desouza interviewed witnesses, he later noted that the incident was "non-reportable." [ECF No. 38-1, p. 50:10–13]. Petisco did not know why the incident was deemed non-reportable. *Id.*

As Sosa outlines, three of the approximately eight eyewitnesses to the incident testified that they told or overheard other passengers tell Carnival crewmembers to clean up the water on the floor before the time that Sosa slipped and fell. [ECF No. 38, p. 7]. Therefore, Sosa argues, "the CCTV footage *likely* shows passengers pointing to the floor, talking or gesturing to Carnival crewmembers, or gesturing towards the floor in an effort to get Carnival staff to clean up the water." *Id.* (emphasis added).

In a similar vein, Sosa emphasizes that, before the incident, two eyewitnesses testified that they observed water leaking from the ceiling above the area where Sosa fell. [ECF No. 38, p. 8]. But she also highlights the fact that other eyewitnesses testified they did *not* see water leaking from the ceiling, which she says means that "the CCTV footage is crucial to this issue." *Id.* Therefore, Sosa concludes, "[e]ven if Carnival's assertion that the CCTV footage did not capture the floor is taken as true, this leaking/dripping occurrence is *very likely* to be depicted on the CCTV footage, because it occurred above the floor." *Id.* (emphasis added).

Because of the slip and fall, Sosa suffered severe and painful injuries, including a torn hamstring in her right leg, a torn rotator cuff in her left shoulder, and lower back injuries. Thus, Sosa argues, "[i]f the CCTV footage showed Mrs. Sosa falling, it would go to **causation.**" [ECF No. 38, p. 9].

Finally, Sosa points out that some eyewitnesses testified that it took Carnival crewmembers too long to provide her with medical assistance -- a scenario she says is

also "likely depicted" on the CCTV footage and that "provides even further support for why Carnival's security officer likely deleted or failed to save the footage during the course of his investigation." [ECF No. 38, pp. 9–10].

Sosa is skeptical of the "security officer's unilateral assertion that 'the exact condition of the floor could not be seen in CCTV as the view was blocked by couch walls.'" [ECF No. 38, p. 10]. She suggests that a note -- that the CCTV footage "revealed that Ms. Sosa was walking in the aisle at Freedom restaurant, aft, starboard side heading towards the end of the buffet line and *her right foot apparently slipped* and she fell on the floor" -- is illogical and contradictory. *Id.* Sosa then generates a question that she believes proves the claim of inconsistency: "[i]f the CCTV footage did not capture the floor, then how could he know that Plaintiff's right foot slipped in the fall?" *Id.*

Sosa also is leery of Carnival's later account of what its security officers viewed on the CCTV footage, deeming it "undoubtedly self-serving." *Id.*

To bolster her argument that Carnival acted in bad faith, Sosa also emphasizes that Carnival's evidence-preservation procedures required it to preserve the CCTV footage for at least 14 days. [ECF No. 38, p. 12]. She highlights that Carnival received notice of Sosa's intent to file a claim on day 13, which, she says, should have triggered immediate steps to preserve the footage. *Id.* "This circumstance," she argues, "in itself, shows that Carnival (most likely by and through [its] security officer) intentionally destroyed the CCTV footage before it could ever be preserved on Day 13." [ECF No. 38,

p. 13]. Sosa similarly alleges that Carnival's security officer "likely" decided to destroy the CCTV footage "when he unilaterally decided that Plaintiff's incident was 'not reportable.'" [ECF No. 38, p. 14].

In her spoliation motion, Sosa says that Carnival's "explanation for the destruction of the CCTV footage" is that "officer Desouza somehow forgot to save it." [ECF No. 38, p. 17]. But that is not *exactly* Carnival's explanation.

In its opposition response, Carnival says that "there is no indication or evidence that security officer Desouza had difficulty saving the footage nor was there any indication that the footage was not successfully saved to the F drive." [ECF No. 47, p. 10]. And in fact, Carnival adds, "there is no evidence that the footage was not successfully saved and became lost due to some glitch outside the control of the security officer." [ECF No. 47, p. 11]. Carnival further submits that the lost footage "*can* be explained as not involving bad faith." *Id.* Carnival highlights that the security officer noted that he *did* save the footage "for further reference" and underscores that "[h]is notes do not reveal any difficulty saving the file or any deletion of the file." *Id.*

Instead of urging the theory that Desouza somehow forgot to save the footage, Carnival claims that it does not know for certain how or why the video is not available, but it posits four "credible possibilities." *Id.*[1]

---

[1]     After the briefing on the sanctions motion was complete, Carnival filed Desouza's affidavit, signed in India. [ECF No. 56-1]. The Undersigned granted Sosa's

First, Desouza could have saved the video file to the dropbox, but then neglected to save it to another drive, such as the F drive. Under this theory, the footage would have been automatically deleted after 14 days even though Desouza wrote (incorrectly) that the footage had been saved.

Second, the footage *could* have been saved to the F drive (as Desouza noted), but at some point between the incident and Sosa's discovery request, a technical issue, such as a server malfunction at sea or a computer virus, could have caused the video loss.

Third, the footage could have been "innocently deleted by someone with access to the F drive." [ECF No. 47, p. 12].

Fourth, if the F drive was a flash drive, then the drive itself may simply have been misplaced. (But Sosa notes in her reply that Carnival previously said that Petisco "testified that the F drive is one of the drives on the ship's computer" [ECF No. 49, p. 9].) In other words, Carnival's suggestion that a flash drive could have been lost is fundamentally inconsistent with the explanation that the F drive is on the actual ship, in its computer (and not on a flash drive).

At the hearing on the spoliation sanctions motion, Carnival asserted several arguments against Sosa's theory of circumstantial evidence of bad faith:

1.      Carnival did not strategically "send" Desouza home to India to make him unavailable for a deposition. Rather, to comply with immigration requirements,

motion to strike the affidavit because it was untimely and unauthorized. [ECF No. 59]. The affidavit did not explain how or why the CCTV footage cannot be located.

14

Carnival had a duty to repatriate a foreign national like Desouza to his home country after his contract expired.

2.      Carnival located Desouza in India and offered to make him available for a telephone deposition, but Sosa refused the opportunity.

3.      *Desouza* did not deem the incident non-reportable; instead, a member of the medical team made that decision. (In response to the Undersigned's questions, Carnival said that the records do not typically disclose which medical team member would make such a decision. Carnival also said that it does not know which medical team member deemed the incident here non-reportable.)

4.      Desouza has the discretion to conduct an investigation even if not specifically asked to do one and even if a medical team member classifies the incident as non-reportable.

5.      Other than not completing an accident report and not taking additional photographs, Desouza took all the other steps he would have taken in a full-fledged investigation of a reportable incident.

6.      Desouza may not be at fault for Carnival's inability to locate the CCTV footage.

7.      The CCTV footage usually ("9 out of 10 times") *helps* Carnival in a personal injury lawsuit.

8.      There is nothing nefarious about Carnival's failure to take extraordinary

steps to preserve the video to ensure it was not automatically overwritten after 14 days because Carnival assumed that the video had been preserved (as noted in the Security Watch Report).

9.      Sosa has ample alternative evidence of what happened, as she has taken several eyewitness depositions.

## II.      Applicable Legal Standards

United States District Judge Cecilia M. Altonaga referred the spoliation sanctions motion to the Undersigned. [ECF No. 40]. The Undersigned is authorized to enter an order, as opposed to a report and recommendations. "Even [where] a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Federal Rule of Civil Procedure 72(a). *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519–20 (10th Cir. 1995); *see also Taverna Imports, Inc. v. A & M Wine & Spirits, Inc.*, No. 15-24198-CIV, 2018 WL 3611405, at *10 (S.D. Fla. July 27, 2018) (explaining that magistrate judge has authority to enter a sanctions order, as opposed to a report and recommendations, when sanctions are denied).

Although this ruling is in an order, the parties may, of course, still pursue objections. Under Rule 72(a), a party may object to a magistrate judge's decision of a non-dispositive matter. Fed. R. Civ. P. 72(a). "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly

erroneous or is contrary to law." *Id.; see also* 28 U.S.C. § 636(b)(1)(A). But this standard of review is "extremely deferential." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397-KAM, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015). "A finding or recommendation is clearly erroneous if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Blake v. Batmasian*, No. 15-81222-CIV, 2018 WL 3829803, at *2 (S.D. Fla. Aug. 9, 2018) (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)).

Or as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Tolz v. Geico Gen. Ins. Co.*, No. 08-80663-CIV-JOHNSON, 2010 WL 384745, at *2 (S.D. Fla. Jan. 27, 2010) (internal quotation omitted). "[T]he 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

Spoliation is defined as the "intentional destruction of evidence or the significant and meaningful alteration of a document or instrument" and "the intentional concealment of evidence." *Brown Jordan Int'l, Inc. v. Carmicle*, No. 0:14-CV-60629, 2016

WL 815827, at *34 (S.D. Fla. Mar. 2, 2016), *aff'd*, 846 F.3d 1167 (11th Cir. 2017) (internal

quotations omitted). A district court's power to sanction a party for spoliation of

evidence derives from two sources: (1) the Federal Rules of Civil Procedure and (2) the

court's inherent power to control the judicial process and litigation. *See* Fed. R. Civ. P.

37(e); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (explaining that

district courts have inherent power to impose sanctions for discovery abuses to

"prevent unfair prejudice to litigants and to [ensure] the integrity of the discovery

process").

The first threshold *substantive* question that must be addressed is whether Rule

37(e), which was amended in 2015 and went into effect on December 1, 2015, or inherent

power principles developed in the common law, governs the spoliation motion at issue.

The parties' initial briefing focused on the Court's inherent power to impose sanctions,

as developed in the common law, rather than engaging in an analysis tied solely to Rule

37(e). And the Eleventh Circuit has not *expressly* determined that Rule 37(e) always

applies when the requested spoliation sanctions award involves ESI.

Accordingly, the Undersigned required the parties to brief the issue, and they

have done so. [ECF Nos. 64–66]. Now that the supplemental briefing is in, it is clear that

the parties have a fundamental disagreement over Rule 37's applicability.

Rule 37(e) provides as follows:

**(e) Failure to Preserve *Electronically Stored Information*.** If electronically
stored information that should have been preserved in the anticipation or

conduct of litigation is lost *because a party failed to take reasonable steps to preserve it*, and it cannot be restored or replaced through additional discovery, the court:

**(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; *or*

**(2)** *only* upon finding that the party acted with the *intent to deprive* another party of the information's use in the litigation may:

**(A)** presume that the lost information was unfavorable to the party;

**(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

**(C)** dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37 (emphasis added).

The advisory committee's notes to the 2015 amendment explain that the newly amended rule "*forecloses reliance* on inherent authority or state law to determine when certain measures would be used" for the loss of ESI. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (emphasis added).

In *ML Healthcare Services, LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293 (11th Cir. 2018), the Eleventh Circuit explained that Rule 37(e) was amended "to address the spoliation of electronically stored information *like the video at issue here*" (i.e., destruction of a video from a grocery store for all but the one hour immediately surrounding the plaintiff's accident), but then noted that it had "not yet had the opportunity to determine whether, given the above amendment, the multi-factor test in *Flury* is still applicable when a party seeks sanctions based on the spoliation of electronically stored

evidence." *Id.* at 1307–08 (emphasis added). The *Flury* test refers to the multi-factor test that the Eleventh Circuit borrowed from Georgia spoliation law in *Flury v. Daimler Chrysler Corporation*, 427 F.3d 939 (11th Cir. 2005). The *ML Healthcare* Court also noted that it did not need to make that determination because the result in the case before it would be the same under either approach.

About eight months later, in *Tien v. Red Coats, Inc.*, No. 16-12347, 2018 WL 5025240 (11th Cir. Oct. 17, 2018), the Eleventh Circuit cited *ML Healthcare* and the factors it discussed for spoliation sanctions[2] and then cited Rule 37(e) for the findings a court would need to reach to cure any prejudice arising when "electronically stored information has not been preserved." *Id.* at *2. Because the *pro se* appellant had not provided a transcript, the *Tien* Court could not determine whether the spoliation issue

---

[2]    The *Flury* factors mentioned in *Tien* (and cited again in *ML Healthcare)* are "(1) whether the party seeking sanctions was prejudiced and whether any prejudice was curable, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and [(4)] the potential for abuse if sanctions are not imposed." *Tien*, 2018 WL 5025240, at *2.

As explained in *ML Healthcare*:

Prior to the amendment of Rule 37, this Court held that an adverse inference instruction is only proper "when the absence of [the] evidence is predicated on bad faith." Likewise, an adverse inference instruction is only available under Rule 37(e) if the court finds that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation."

*ML Healthcare*, 881 F.3d at 1308 (internal citations omitted).

was ever brought to the district court's attention. *Id.* Nevertheless, it seems as though the appellate court *assumed* that Rule 37(e) would apply to spoliation involving ESI (though it did not expressly state that). Although the Eleventh Circuit panel discussed *ML Healthcare*, it did not mention that its decision there included a specific declination to decide whether Rule 37(e) applied to ESI like a video.

As noted, the *Tien* Court did not directly discuss whether amended Rule 37(e) applied, perhaps because *ML Healthcare* did not decide that issue. But even if *Tien* had tackled the issue head-on and announced a decision, it still would not be binding because it is not an officially published decision.[3] So the issue of whether Rule 37(e) applies to ESI-like video footage to the exclusion of the inherent power developed in the common law is likely still *technically* an open issue in this Circuit.

As a *practical* matter, however, the Undersigned views the issue as a straightforward one and concludes that Rule 37(e) "now governs a district court's power to sanction a party for spoliation of electronically stored information." *Wooden v. Barringer*, No. 3:16-CV-446-MCR-GRJ, 2017 WL 5140518, at *3 (N.D. Fla. Nov. 6, 2017). Moreover, as *Wooden* also recognized (by quoting the advisory committee's notes), Rule 37(e) "*forecloses* reliance on inherent authority to impose sanctions for spoliation." *Id.* at *4 (emphasis added).

---

[3]     Eleventh Circuit Rule 36-2 provides, in pertinent part, that "unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." Eleventh Circuit Rules, Rule 36-2.

Other district courts in this Circuit have likewise determined that Rule 37(e), and not a court's inherent authority, governs the issue of spoliation sanctions for loss of ESI. *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, No. 3:16-MD-2734, 2018 WL 4856767, at *2 (N.D. Fla. Oct. 5, 2018) ("The law applicable to destruction of emails and other ESI is now controlled by Rule 37(e)"); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740 (N.D. Ala. 2017) (explaining that Rule 37(e) forecloses reliance on inherent authority to sanction spoliation of ESI); *Living Color Enter's, Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-62216, 2016 WL 1105297, at *4 (S.D. Fla. Mar. 22, 2016) (same); *Keim v. ADF Midatlantic, LLC*, No. 12-CV-80577, 2016 WL 7048835, at *3 (S.D. Fla. Dec. 5, 2016) (same); *see also United States Equal Emp't Opportunity Comm'n v. GMRI, Inc.*, No. 15-20561-CIV, 2017 WL 5068372, at *26–27 (S.D. Fla. Nov. 1, 2017) (discussing Rule 37's applicability to ESI); *Storey v. Effingham Cty.*, No. CV415-149, 2017 WL 2623775, at *5 (S.D. Ga. June 16, 2017) (discussing the "unique and irreplaceable nature of [video] evidence" in contest of Rule 37 sanctions).[4]

District courts in other Circuits have also agreed that Rule 37(e) is the controlling

---

[4]     On the other hand, there are a few opinions in this district after December 2015 that do not discuss Rule 37 when evaluating an ESI spoliation sanctions motion, but that still rely on the inherent authority doctrine. *See Henkle v. Cumberland Farms, Inc.*, No. 16-14248-CV, 2017 WL 5635400 (S.D. Fla. June 15, 2017) (addressing spoliation sanctions motion concerning failure to preserve surveillance video footage of plaintiff's trip-and-fall incident, but without even mentioning rule 37(e) in its discussion). But the Undersigned does not find this approach persuasive. Neither the motion, the response, nor the reply in that case mentioned newly amended Rule 37(e), which went into effect well more than a year earlier than the May 2017 motion.

standard for ESI spoliation claims. *See Braun v. Sterno*, No. 3:18-CV-919 (JCH), 2018 WL 5778248, at *6 (D. Conn. Nov. 2, 2018) (explaining that the standard of culpability to establish spoliation sanctions changed after the 2015 amendment to Rule 37(e)); *EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, No. 3:12-CV-00463, 2018 WL 1542040, at *1 (M.D. Tenn. Mar. 29, 2018) ("Amended Rule 37(e) applies to sanctions for the loss of ESI in this case, but not the loss of physical evidence.").

Based on the plain language of Rule 37, the advisory committee notes, and recent case law, Rule 37(e) very likely controls spoliation claims involving ESI to the exclusion of the common law analysis undertaken under the Court's inherent authority.

As discussed below, however, the parties disagree on the issue of whether the lost video footage is, in fact, *ESI*.

Rule 37(e) significantly limits a court's discretion to impose sanctions for ESI spoliations. Thus, as a preliminary matter, because the rule applies only to ESI, the preliminary inquiry is whether *ESI* is what was lost. *See Living Color*, 2016 WL 1105297, at *4 ("If the alleged spoliation involves ESI, then Rule 37(e) applies."). Then, as outlined in *In re Abilify*, "four conditions" must be met before imposing sanctions for the spoliation of ESI:

> First, the ESI should have been preserved in the anticipation or conduct of the litigation. Second, the ESI is lost or destroyed. Third, the loss of the ESI is due to the party's failure to take reasonable steps to preserve the ESI. Last, the ESI cannot be restored or replaced through additional discovery.

*In re Abilify*, 2018 WL 4856767, at *2. If any of the above questions are answered in the

negative, then "a motion for spoliation sanctions or curative measures must be denied." *Id. (*citing Living Color, 2016 WL 1105297, at *4–5).[5]

Beginning with whether Carnival's CCTV footage is ESI, the Federal Rules of Civil Procedure do not define ESI. Instead, the advisory committee's notes to Rule 34 broadly discusses ESI as covering all current types of computer-based information that are not in tangible form. Fed. R. Civ. P. 34 advisory committee's note to 2006 amendment. Carnival conceded at the hearing and in its post-hearing memorandum that video surveillance is ESI. [ECF No. 65, pp. 1–2].[6] And courts seem to implicitly conclude the same. *See Wooden*, 2017 WL 5140518, at *4 ("[V]ideo recordings (which presumably are digital) constitute ESI."); *Storey*, 2017 WL 2623775, at *3 ("Here, there's no debate that the surveillance and taser videos are ESI."); *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017) (finding that video data, which was saved on the jail's server and then overwritten, constituted ESI).

In Sosa's post-hearing memorandum, her counsel explains that she was unable to

---

[5] The *Living Color* Court deemed the first question (does the loss involve *ESI*?) to be a preliminary, threshold issue that, if answered affirmatively, triggers the *next* four questions outlined in *In re Abilify*. The Undersigned has designated this initial inquiry to be the *first of five* questions. But regardless of the numbering system, the Undersigned is assessing the same factors used in *Living Color*.

[6] Carnival explained that "because the video was stored on the computer drive, and subsequently lost, "it falls under the scope of Rule 37(e)." But this assumes that Desouza successfully downloaded the video footage to the F drive, as opposed to a scenario where he tried but failed to download it.

locate any case in which a federal court used a "thorough analysis" and that the case law on this issue is "sparse." [ECF No. 66, p. 1]. Nevertheless, she contends that the lost footage is *not* ESI, and she also posits that the Court may instead use its inherent authority (as opposed to Rule 37(e)) to sanction Carnival.[7]

According to Sosa, to determine whether ESI is involved here, the Court should accept Carnival's position "that the CCTV footage was [not] automatically overwritten under its fourteen (14) day retention policy, but rather was removed to a permanent storage device by its security officer." [ECF No. 66, p. 2]. Once the Court does that, Sosa argues, it should then conclude that the footage "no longer qualifies as ESI." *Id.*

According to Sosa, "[t]he CCTV footage in this case was removed from the protection of electronically stored information under Rule 37(e) when it was allegedly converted to a permanent format by officer Desouza." [ECF No. 66, p. 5]. Sosa alleges that the footage "was later deleted by officer Desouza when he deemed the incident 'non reportable.'" *Id.*

This theory does not convince the Undersigned. I have difficulty accepting both the legal and factual grounds for this position.

Sosa's argument arises from the wording of a *former* version of Rule 37, which, in any event, concerned not the *definition* of ESI, but whether a court could impose sanctions when ESI was lost due to routine overriding from an electronic information

---

[7]     At the hearing, however, Sosa advised that the lost video footage *was* ESI.

system. Specifically, the 2006 amendment provided, in subsection (f), that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37 (2006). The advisory committee's notes to the 2006 amendment explained that the subsection "applies only to information lost due to the 'routine operation of an electronic information system' -- the ways in which such systems are generally designed, programmed, and implemented to meet the party's technical and business needs." Fed. R. Civ. P. 37 advisory committee's note to 2006 amendment.

The notes then went on to say that former Rule 37(f), which *prohibited* the imposition of sanctions under designated circumstances, also contained an inherent exception: it applies to "information lost due to the routine operation of an information system *only if the operation was in good faith*." *Id.* (emphasis added). And the notes then explained that good faith "may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information." *Id.*

This language from the text of Rule 37 remained until the 2015 amendment. The pre-2015 language did not define ESI or specify what types of sanctions a court *could* impose for the loss of ESI. Instead, it *prevented* a court from imposing sanctions under Rule 37 when the ESI was lost as a result of the routine, good-faith operation of an electronic information system.

But the 2015 amendment changed the focus of the Rule from one *precluding* sanctions in designated situations to one *authorizing* specific measures that a court *may* take -- but restricting the harshest sanctions to scenarios involving bad faith (i.e., an "intent to deprive"). Perhaps most importantly, as the notes succinctly and clearly explain, the current version does not permit a federal court to rely on inherent authority or state law "to determine when certain measures should be used." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment. Thus, if the lost evidence is ESI, then sanctions can be imposed only as Rule 37 permits (which was re-designated as subsection (e) from subsection (f)). And if the lost evidence is not ESI, such as a ladder or a car, then the rule is inapplicable in the first place, and courts may use their inherent authority to issue sanctions.

Rule 37's current *text* does not contain any language about the routine, good-faith operation of electronic information systems. Instead, the rule covers a party who "failed to take reasonable steps to preserve [ESI]." Fed. R Civ. P. 37(e). But the language about routine operations is now found as policy and analysis considerations in the advisory committee notes, which explain that "the routine, good-faith operation of an electronic information system would be a relevant *factor* for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information[.]" Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (emphasis added).

Therefore, if the question is whether Carnival should have stopped an automatic overwriting process of the CCTV footage, then the question is clearly addressing ESI. As the committee's notes point out, the routine overriding of information is "a feature with no direct counterpart in hard-copy documents." Fed. R. Civ. P. 37 advisory committee's note to 2006 amendment. So Carnival's actions or inactions would just be a *factor* in the analysis (as opposed to the *result* under the earlier version of the rule -- i.e., the Court could not impose sanctions if the failure to suspend the automatic overwriting feature was deemed to be carried out in good faith).

Turning to the factual assumption in Sosa's memorandum, Sosa relies on Carnival's contention that Desouza removed the footage from the automatic overwriting system, and, therefore, the footage *was* placed in a permanent storage device. But although her memorandum *says* that her position is based on Carnival's position, the remainder of her argument makes it clear that she does not believe Carnival's position.

To be sure, neither the parties nor the Undersigned knows whether Desouza (1) succeeded in downloading the footage, (2) failed to download the video but thought he did, (3) destroyed the video and then made up a story about downloading the video to the F drive, or (4) has no explanation for the loss of the video.

But Sosa is in large part responsible for the incomplete factual record because she refused to take a telephone deposition of Desouza, which could have shed additional

light on this murky record.

Had Sosa taken Desouza's deposition, she could have asked questions designed to determine the steps he took to download the video; whether those steps were based on a procedures manual; whether he double-checked the F drive to see if he actually succeeded in downloading the video; whether he viewed the video from the temporary dropbox or the F drive; whether he ever downloaded CCTV video before in other incidentes (and, if so, whether he followed the identical procedure); whether the F drive is an onboard computer or a flash drive; and whether the video revealed other relevant evidence besides the supposedly blocked spot where Sosa fell (such as other passengers pointing to leaking or standing water).

Had she taken Desouza's deposition, Sosa could have also probed the circumstances she views as suspicious, such as whether he began the investigation on his own or because someone asked him to; who asked him to investigate (assuming he did not decide himself); who designated the incident as non-reportable; when he was told the investigation was non-reportable; how that status was communicated to him (and by whom); and why he decided to stop an investigation he had substantially completed.

If (as Sosa assumes in some portions of her memorandum) the video was downloaded to an onboard *drive in the ship's computer* (and was somehow lost or destroyed after that), then that does not mean that Rule 37(e) is somehow inapplicable

or that the footage is not ESI. How would video footage downloaded to a computer *not* be ESI? Sosa has not cited any persuasive authority to prove that information transferred to a hard drive is not ESI. It may well be that Desouza's decision to transfer and download the video was not routine, but that would be a *factor* in evaluating potential remedies, not a situation causing the lost footage to be classified as non-ESI.

Sosa's reliance on the advisory committee's notes to the 2006 amendment to Rule 37 is unavailing. The 2015 advisory committee's notes explain that "[n]ew Rule 37(e) *replaces* the 2006 rule." Fed. R Civ. P 37 advisory committee's note to 2015 amendment (emphasis added). In addition, the rule was couched in the negative, as a prohibition. And it did not say that information stored in an electronic information system was *not ESI* if it was lost in a non-routine manner. In fact, that sort of information would be ESI, and the former version of Rule 37 would still permit a court to enter sanctions -- albeit under its inherent authority.

Sosa argues that the Court's inherent authority, not Rule 37(e), controls the sanctions issue here because the rule applies *only* to information deleted during the *routine* operation of computer systems, such as systems that automatically overwrite recordings. Sosa contends that "there was nothing routine about Desouza's investigation, his allegedly ill-fated attempt to store the CCTV video, or the aftermath of his internal investigation." [ECF No. 66, p. 3].

But Sosa's argument seems inconsistent with the harshest sanctions authorized

in subsection (e)(2), which requires a finding that the party "acted with the intent to deprive" the opponent of ESI. Fed. R. Civ. P 37(e)(2). A specific intent to deprive appears to be markedly different than a "*routine* operation of an electronic information system." Indeed, a bad faith intent to deprive appears to be on the opposite end of the spectrum from a routine computer system operation.

If, as Sosa argues, this subsection applies only to losses triggered by *routine* operations, then how would an intent to deprive even be an issue for consideration under the rule? Under Sosa's view, a party who specifically and strategically directed its information technology officer to delete targeted emails from a server because those emails helped the opposing party would not be subject to a dismissal under subsection (e)(2)(C) because the emails were not deleted as part of a "routine" operation of an email server system (and would therefore not be ESI in the first place). This consequence of Sosa's theory appears at odds with the text and policy of the rule.

On the other hand, on the basis that "Rule 37 does not directly address destruction of video equipment or video footage," one court has used its inherent authority to determine whether sanctions were appropriate when video evidence was spoliated. *See Oppenheimer v. City of La Habra*, No. SACV1600018JVSDFMX, 2017 WL 1807596, at *7 (C.D. Cal. Feb. 17, 2017). But unlike that case, this case involves video footage allegedly *downloaded* to a shipboard computer and stored in one of its hard drives. Moreover, and more importantly, the *Oppenheimer* Court did not give a legal

reason for relying on its inherent authority, instead of Rule 37, other than to succinctly point out the obvious fact that the rule "does not directly address destruction of video equipment or video footage." *Id.* That one sentence is the extent of its analysis, so the Undersigned does not find this non-binding decision persuasive.

To compound the uncertainty, the Eleventh Circuit stated in *ML Healthcare*, albeit without analysis, that Rule 37 "was amended to address the spoliation of electronically stored information *like the video at issue here*." 881 F.3d at 1307 (emphasis added). In that case, the defendant had preserved one hour of video related to the plaintiff's accident, but "the remainder of the video was erased in the usual course of business." *Id.* The Eleventh Circuit expressly declined to determine whether Rule 37 or the Court's inherent authority governed the spoliation issue, and the Court did not discuss any potential distinction between video destroyed in the normal course of business and video lost under other circumstances. But it certainly did say (even though it was in a conclusory fashion) that the video in that case *was* ESI.

Even so, the Undersigned does not view *ML Healthcare's* conclusory statement as providing definitive guidance on whether the video here is ESI.

At bottom, however, Sosa incorrectly conflates the definition of ESI with the issue of whether its loss in a particular case would permit sanctions. Just because certain circumstances dictate that sanctions are inappropriate for lost ESI (such as, for instance, because the movant did not establish that the opponent failed to take reasonable steps

to preserve it) does not mean that the material is not ESI. It simply means that sanctions for the loss of that particular ESI and under that specific scenario are unwarranted.

A few hypotheticals illustrate the point.

**First Hypothetical**: On the very day that a passenger was injured, a cruise ship security chief orders surveillance video from a camera destroyed because it shows a passenger being knocked on the head by a piece of metal falling from an overhead deck. The video is ESI. But sanctions under Rule 37(e) are unavailable because other footage capturing the same image (from another camera located nearby) *is* available. Thus, the passenger seeking sanctions under Rule 37(e) could not obtain them because she cannot meet one of the threshold requirements: establishing that the lost video footage "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). But this does not mean that the video is not ESI or was never ESI. It merely means that sanctions under the rule cannot be imposed.

**Second Hypothetical:** A cruise ship employee sends an email on a ship computer to another onboard employee, noting that the eggs benedict served at breakfast looked like they had remained under the heating lamps for longer than usual. An e-mail, of course, is quintessential ESI. The ship's emails are automatically deleted (and not saved to a server) after one month. Six weeks after the cruise ended, a passenger files a lawsuit, alleging that he became ill from the eggs and was required to undergo gastrointestinal surgery. The passenger did not report the incident to the cruise

company at the time because he ate the eggs on his final day on the cruise and did exhibit any symptoms until the following day, after he departed the ship. The e-mail cannot be produced in discovery because it had been deleted during the ship's routine deletion policy. The magistrate judge denies the passenger's spoliation sanctions motion because "perfection in preserving all relevant electronically stored information is often impossible" and because the "routine, good-faith operation of an electronic information system" is a relevant factor for assessing whether the cruise ship operator failed to take reasonable steps to preserve lost information. Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment. The underlying circumstances caused the magistrate judge to deny the motion, but they did not somehow convert what was ESI into non-ESI.

**Third Hypothetical:** The family of a cruise ship passenger who died from a raging, improperly-treated infection in a ship medical clinic files a lawsuit against the cruise ship operator. The lead doctor on the ship directed the chief security officer to transfer and preserve a video of the patient's in-clinic treatment. The officer successfully downloaded and preserved the video to a hard drive in the ship's master computer/server system, and he confirmed that the video is accessible from that drive. The initial version of the video was automatically deleted two weeks later, but it is undoubtedly stored in the hard drive. Three days after the initial video was automatically deleted, an electrical storm pounds the ship, and lightning knocks out all data saved on the drive. The plaintiffs are unable to obtain the adverse inference

presumption they seek because the judge determines that there was no evidence that the cruise ship operator "acted with the intent to deprive another party" of the video footage's use in the lawsuit. Fed. R. Civ. P. 37(e)(2). The ESI wiped out from the hard drive during the storm is still ESI, regardless of the plaintiffs' inability to obtain the requested relief under Rule 37(e).

In short, the Undersigned rejects Sosa's efforts to describe the CCTV footage (whether automatically deleted from its original location or somehow missing from the F drive) as not being ESI in the first place.

Therefore, framed by the principles outlined above, including the Undersigned's rejection of Sosa's ESI definition, the hazy factual record, and several courts' assumptions that videos are ESI as contemplated by Rule 37, the Undersigned concludes that the lost CCTV video footage *is ESI governed by Rule 37 and that inherent authority cannot be used*. As a result, Sosa need not establish that the lost footage is "crucial" to her case to obtain some relief.

Returning to the Rule 37 assessment, Carnival admits that it had a duty to preserve the CCTV footage at issue, so there is no need to analyze that issue.

Before discussing whether Carnival took reasonable steps to preserve the lost CCTV footage (the next factor from Rule 37(e)), the Undersigned deems it helpful first to outline some of the realities of ESI that are discussed in the advisory committee's notes to the latest amendment to the rule. By way of overall summary, those notes

establish that ESI preservation is difficult and that the mere loss of ESI does not by itself mean that curative measures are warranted.

Rule 37 has two categories of relief: those in subsection (1) and the more-consequential ones in subsection (2). The sanctions available in subsection (2) require bad faith (i.e., the "intent to deprive"). But *both* categories of relief, including the "no greater than necessary to cure the prejudice" type in subsection (1), require that four preliminary factors be established. The following points, all discussed in the advisory committee's notes, help inform the realistic, practical assessment of the third factor (i.e., whether the party "failed to take reasonable steps to preserve" the ESI):

1. The rule applies only to ESI and only when ESI is lost.

2. "Perfection in preserving all relevant electronically stored information is often impossible." Similarly, the rule "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."

3. The rule is "inapplicable when the loss of information occurs despite the party's reasonable steps to preserve."

4. "[I]nformation the party has preserved may be destroyed by events outside the party's control -- the computer room may be flooded, a "cloud" service may fail, a malign software attack may disrupt a storage system, and so on."

5. If ESI information is lost because a party failed to take reasonable steps to preserve it, then "the initial focus should be on whether the lost information can be

restored or replaced through additional discovery." Thus, "[i]f the information is restored or replaced, no further measures should be taken."

6.     "[A] court may resort to (e)(1) measures only 'upon finding prejudice to another party from loss of the information.'"

7.     "The rule does not place a burden of *proving or disproving **prejudice*** on one party or the other." (emphasis added).

8.     The standard for the "specified and very severe" measures found in subsection (e)(2) rejects cases "that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."

9.     "Negligent or even grossly negligent behavior does not logically support" the inference that lost evidence was "unfavorable to the party responsible for loss or destruction of the evidence" because "[i]nformation lost through negligence may have been favorable to either party, including the party that lost it[.]"

10.    "Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information" because the required intent-to-deprive finding also supports "an inference that the opposing party was prejudiced by the loss of information that would have favored its position."

11.     Courts should use caution in using the (e)(2) measures. Finding the requisite intent does not require a court to adopt any of the (e)(2) measures. "The remedy should fit the wrong" and the "severe measures . . . should not be used when

the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."

The Undersigned now turns to the thorny question of whether Carnival took reasonable steps to preserve the ESI. If Carnival did take reasonable steps, then no further remedies under (e)(1) or (e)(2) are available. As noted above, the record on this is far from clear.

But first, the Undersigned needs to discuss the appropriate burden of proof. As highlighted above, the advisory committee's notes discuss the burden for only one of the factors: prejudice. They say nothing about which party has the burden (or if *any* party has the burden) on any other factor, including the issue of whether the party accused of spoliation took reasonable steps to preserve the ESI.

Although the committee's notes are not statutory text, principles of statutory construction come to mind. "A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *United States v. Spoor Tr. of Louise Paxton Gallagher Revocable Tr.*, 838 F.3d 1197, 1202–03 (11th Cir. 2016) (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006)). This rule of construction is also worded in slightly different terms, but with the same result: "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

Applying this principle of construction here, the committee's decision to explain that neither party bears the burden on the prejudice factor, but to then omit a similar explanation for the other Rule 37 factors, generates the presumption that the committee does not adopt that same no-burden-on-either-party approach for the other factors. Therefore, because neither Rule 37 nor the advisory committee's notes provide any guidance on which party has the burden on the issue of whether the party who lost the ESI took reasonable steps to preserve it, the Undersigned will use the approach that our Circuit uses when analyzing spoliation motions under the inherent-authority doctrine.

In our Circuit, the party seeking spoliation standards has the burden to prove the common law factors. *See Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010). Following the 2015 amendment to Rule 37, other courts have placed the burden to establish the factors on the party seeking the sanctions. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, No. 3:12-CV-00154-TBR, 2018 WL 3721385, at *4 (W.D. Ky. Aug. 3, 2018) (finding that plaintiffs (who were seeking spoliation sanctions) did not satisfy their burden of showing that defendant failed to take reasonable steps to preserve data files from a former litigation database).

Thus, Sosa has the burden to establish that Carnival did not take reasonable steps to preserve the CCTV video footage.

Sosa's spoliation sanctions motion does not rely on Rule 37(e). Indeed, she does

not even mention the 2015 amended rule governing ESI and the available sanctions under the amended rule. Instead, Sosa relies on pre-amendment case law (based on inherent authority) and, in particular, *Long v. Celebrity Cruises, Inc.*, No. 12-22807-CIV, 2013 WL 12092088 (S.D. Fla. July 31, 2013), an opinion decided approximately two and a half years before amended Rule 37(e) went into effect.

Carnival's response (1) discussed both the Court's inherent authority and Rule 37(e); (2) noted that the Eleventh Circuit avoided the issue in its 2018 *ML Healthcare* decision; (3) explained that some courts in the Southern District of Florida continue to use inherent authority caselaw, while some use the amended rule; (4) argued that there was no bad faith (if the inherent authority analysis is used); and (5) contended that it took reasonable steps to preserve the CCTV footage (if the amended rule were to apply). As noted above, the Court is using Rule 37(e).

After Carnival submitted its response, Sosa filed a reply in which she discussed Rule 37(e). Among other points, she argues that she can still use circumstantial evidence of Carnival's bad faith to support her argument for sanctions after the amendment of Rule 37(e). *See, e.g.*, *In re Abilify*, 2018 WL 4856767, at *9. Of course, the issue of bad faith (i.e., intent to deprive) is analyzed only if the other requirements are all met, including the movant's need to show that the alleged spoliator failed to take reasonable steps to preserve the ESI.

Not surprisingly, Carnival contends that its efforts to preserve the CCTV footage

were reasonable. It points to the security watch report entry which states that the footage "is saved in F drive under Exacq vision files" and that it was there "for further reference." [ECF No. 47, pp. 2, 11]. And it argues that "[t]he fact that CCTV could not be located and retrieved a year after it was saved does not establish that Carnival did not take reasonable steps to preserve it at the time." [ECF No. 47, p. 13].

Sosa, for her part, argues that Carnival's attempts to "explain-away what happened to the CCTV footage fall short of reality." [ECF No. 49, p. 8]. She submits that Carnival's theory about an unidentified "glitch" outside of Desouza's control is a conclusory assertion not supported by any evidence. [ECF No. 49, p. 9]. She also argues that "Carnival cannot credibly explain what happened to the CCTV footage," a development she describes as particularly suspicious given Carnival's designation of the incident as "non-reportable" even though Desouza conducted several eyewitness interviews. *Id.*

Determining whether Carnival's loss of the video reflects a bad faith intent to deprive Sosa of the CCTV footage concerns a different issue than assessing whether Carnival took reasonable steps to preserve it. It is entirely possible that Carnival did not act reasonably, but that it lacked the bad faith intent to deprive Sosa of the CCTV video evidence.

Although it was not evaluated under amended Rule 37(e), *Long* provides significant guidance because the facts there are significantly analogous.

In *Long*, a cruise ship passenger suffered injuries while attempting to descend a stair on the ship. In a written request for obtaining onboard medical care, the passenger alleged that a piece of metal sticking up from the step caused her fall. The ship's safety officer spoke with the plaintiff, interviewed a witness, inspected the relevant area, and reviewed the video surveillance. The officer also prepared a report which stated that the plaintiff had not tripped on a piece of metal trim on the stair, but had simply missed the step.

After reviewing the video, the security officer in *Long* unsuccessfully tried to download the video footage to a computer. He then asked another officer to help him download the video, but did not follow-up before the end of the cruise to confirm that the download was successful. The video footage was then permanently overwritten after 14 days.

Similar to Desouza's security watch report, the incident report the security officer prepared in *Long* also contended that the video supported the cruise ship's position and undermined the passenger's version. Moreover, the cruise ship operator in *Long* raised another argument that Carnival also asserts here: that the video could not have been useful or critical to the plaintiff because it would not have depicted what supposedly happened on the step. Here, Carnival similarly claims that the video did not show the alleged standing water and that the furniture arrangement blocked any view of where Sosa slipped.

The result in both cases is the same: the video footage no longer exists.

The *Long* Court noted that the cruise ship made the missing video crucial to the plaintiff's impeachment of the security officer's credibility by contending that the officer concluded that the video supported the cruise ship's lack of negligence. *Long*, 2013 WL 12092088, at *6. In this case, Desouza contends that the area where Sosa slipped is not visible on the video, which helps Carnival, but admittedly creates less of an issue for Sosa than the plaintiff in *Long*. Saying that a video shows no negligence is more helpful to the defense than saying that the video does not show the site of the fall.

Noting that the destruction of evidence under routine procedures does not generally indicate bad faith, the *Long* Court agreed that the record did not establish bad faith "to the extent that malicious or willful conduct is not found in the record." *Long*, 2013 WL 12092088, at *7. Nevertheless, the Court there found that the record "compelling[ly] demonstrates" the officer's "reckless manner" of treating his duty to preserve the ESI video footage. *Id.* In fact, the Court branded it as "undeniably reckless." *Id.*

The Court then imposed some sanctions, albeit less than the plaintiff's request for an adverse inference jury instruction. Specifically, the *Long* Court precluded the defendant's expert from relying on the content of the video and any other defense witness from testifying about the video's content. *Id.* at *8. In doing so, the trial judge noted that the Court gave the plaintiff an option to elect remedies at oral argument, and

the plaintiff elected to opt for only preclusion of evidence (as opposed to giving a jury instruction about a possible adverse inference but with defense testimony about the missing video's contents). *Id.* at *9.

Conduct deemed undeniably reckless would surely meet the standard of not taking reasonable steps to preserve ESI. Therefore, the conclusion about the cruise ship operator's culpability in *Long* under a pre-2015 inherent-authority analysis would also be the same under a current Rule 37(e) analysis.

In the instant case, Desouza obviously realized the importance of the CCTV footage. He reviewed it and wrote a note about it in the security watch report. He even recorded his effort to download it. And he interviewed witnesses even though someone else (who Carnival has never identified) advised him of the injury and even though someone else (again, not identified by Carnival) on the medical team deemed the incident non-reportable (at a time not specified by Carnival and without making a note of the decision in any document or computer). Yet he did not follow up to confirm that his effort to download the video to the F drive was successful. If he did follow up, then Carnival has not yet explained that on this record.

The Undersigned will not now engage in a fine-tuned analysis and determine whether Desouza acted in a grossly negligent, reckless, or merely negligent way. At this point, all that is necessary for possible Rule 37(e) sanctions is to conclude that Carnival did not act "reasonably" to preserve the ESI. The Undersigned makes that finding.

To be sure, there *might* have been some sort of computer glitch. There *might* have been some sort of weather disturbance that interfered with the download attempt. And there *might* have been another Carnival employee who inadvertently deleted this CCTV video. But Carnival has not introduced any *evidence* suggesting that these are anything more than speculative possibilities. For example, Carnival did not submit any evidence about malware infecting the *Freedom's* computers or a power surge knocking out the computers or a rogue wave trashing the vessel's information technology system. To the contrary, Carnival offered only hypotheticals and theories.

Moreover, some of these theories seem illogical or at least highly unlikely. For example, is it likely that a computer glitch deleted just this one CCTV footage, as opposed to the entire F drive? Carnival has not offered any evidence that the entire F drive was compromised. Similarly, is it logical that only one CCTV video saved to the F drive was deleted or destroyed but that others were not? Again, Carnival has not offered any evidence of mass, indiscriminate deletion. If an employee inadvertently deleted something from the F drive, then there (presumably) should be some metadata or login information to reveal that employee's identity. But, once again, Carnival has not offered any evidence.

Therefore, the Undersigned concludes that Carnival did not take reasonable steps to preserve the CCTV footage.

The next issue that must be resolved before Rule 37(e)(1) or (2) remedies are

activated is whether the CCTV footage "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). This is a straightforward question, and it is different than the one Carnival focuses on its response. Carnival suggests that the issue should be whether the CCTV footage was "crucial" to Sosa's case. [*See generally* ECF No. 47]. But the amended version of Rule 37(e) does not adopt that standard. The mere fact that pre-2015 case law used the "crucial" test does not mean that the Undersigned should read it into the new rule.

There is no other video available to show what the area where Sosa fell looked like at the time of her fall or whether water was on the floor. And the Undersigned does not deem deposition answers from eyewitnesses to be an adequate substitute, especially when some of the witnesses did not recall seeing anything either way.

To the extent that the amended version of the rule incorporates in a more-modest way the "crucial" factor, it is included in the less-harsh subsection (1) remedies, which require only a finding of "prejudice" to another party "from loss of the information." Fed. R. Civ. P. 37(e)(1). That subsection does not require "great" prejudice or prejudice concerning a crucial issue. It simply requires prejudice.[8]

---

[8] By contrast, in this Circuit, under the inherent-authority doctrine, a movant must prove "that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010). It is not enough that the spoliated evidence would have been relevant to a claim or defense. *See Floeter v. City of Orlando*, No. 605CV-400-ORL-22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007); *Managed Care Sols.*, 736 F. Supp. 2d at 1327–28 (finding that allegedly spoliated evidence not crucial to plaintiff's claims

The advisory committee's notes explain that "[d]etermining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that *did not lose the information may be unfair.*" Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (emphasis added).

Concerning potential subsection (1) remedies, Carnival contends that there is no prejudice because Desouza's review of the CCTV video was that "it did not even show the surface on which Plaintiff slipped and fell." [ECF No. 47, p. 14]. But that is what Desouza *says.* Sosa cannot probe the accuracy of that assessment because Carnival inexplicably lost the video footage. Moreover, even if the video did not pinpoint the precise site of Sosa's fall, it might have captured eyewitnesses pointing to leaking water or leaking water in an area near to the site of the fall.

Therefore, the Undersigned concludes that all the *basic* prerequisites for potential remedies under subsections (1) and (2) have been met (assuming that the lost video footage is ESI, which the Undersigned has found that it is). *Cf. Living Color*, 2016 WL 1105297, at *5.

---

because it could prove its case through evidence obtained elsewhere). "Generally, only outcome-determinative evidence constitutes 'crucial' evidence." *Long*, 2013 WL 12092088, at *5; *see also Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1304 (S.D. Fla. 2015) (finding that because several witnesses to an incident existed, missing video was not crucial evidence).

Sosa would not have been able to clear this hurdle (of showing that the lost evidence was crucial) had the inherent authority approach been used because there are other witnesses to her fall and to the surroundings.

Sosa requests an adverse inference jury instruction, but that also requires a finding of an intent to deprive under the rule. Given the fuzzy record, the Undersigned deems it appropriate for the jury to make this assessment. This is contemplated by the advisory committee's notes, and Sosa's reply recognizes it as a "plausible option." [ECF No. 49, p. 9]. Desouza is scheduled to return to work with Carnival in January 2019, and the trial is scheduled for February 2019. He will, therefore, be available for trial, and Carnival may want to arrange for him to appear as a trial witness. If that were to occur, then Sosa would have the opportunity to question him and challenge his credibility, if appropriate.

The Undersigned, however, believes that the jury is entitled to completely understand the facts if tasked with the responsibility of determining whether Carnival had the intent to deprive Sosa of the CCTV evidence. That means that Carnival will have the opportunity to have Desouza testify about what he says he saw on the video (or what he did not see, given that he claims the video did not reveal the location of the fall or any standing water). Sosa may not want the jury to hear that, especially because she and her attorneys will not have had a similar opportunity to review the video, as Carnival says it is now lost.

Therefore, as the party who is seeking remedies and is not responsible for the video's loss, Sosa will have a choice:

(1)      She can have *all* the evidence about the CCTV video and its unavailability

presented to the jury (including Desouza's claim about what the video did or did not show) and argue that Carnival had the intent to deprive her of it (and then, if the jury finds the intent, argue that the jury may find a presumption against Carnival to be appropriate), **or**

(2)     She can prevent Desouza and other Carnival witnesses from testifying about the contents of CCTV footage (and their efforts to preserve it) and simply have the Court advise the jury that Carnival had CCTV video footage at one time, but it is no longer available. Under this approach, a jury instruction about a potential adverse inference would not be given, but Sosa would obtain some relief because Carnival witnesses could not testify about the video and the jury would learn only that the footage is unavailable. In other words, the jury would not hear Desouza testify that the video did not show the site of the incident.

Sosa will undoubtedly encounter a significant hurdle at trial to persuade the jury that Desouza *intended to deprive* her of the video footage. For example, it will be difficult for her to rebut the testimony that this CCTV video appears to be the first time that Carnival has ever lost footage concerning an incident. But she should at least be given the *opportunity*, especially because myriad odd circumstances surround Desouza's involvement in the non-reportable investigation and the lack of detail surrounding the decision to brand the incident non-reportable. On the other hand, she may not want to risk having the jury hear Desouza testify about the video and his purported efforts to

save it and then have the jury *not* make the necessary intent finding.

If Sosa chooses the first option, then, to return to the metaphor invoked at the start of the order, the jury will be tasked with determining whether Desouza and/or other Carnival employees intentionally started a spoliation fire or whether the missing video footage is simply the blame-free smoke that sometimes floats around ESI (and that cannot fairly be deemed to evidence an actual inferno).

## III.     Conclusion

The Undersigned **grants in part** and **denies in part** Sosa's motion for spoliation sanctions, as outlined above. Sosa shall advise the Court in writing about which choice she has selected by **February 5, 2019** (two weeks before the start of the jury trial calendar). And Judge Altonaga, who will preside over the trial, will be the final arbiter on another potential remedial measure: whether the Court should "giv[e] the jury instructions to assist in its evaluation of such evidence or argument [concerning the loss of the footage]." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on December 4, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Cecilia M. Altonaga
All counsel of record